UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

|  |  |  |
|---|---|---|
| MICHAEL PARKER, | ) ) ) | |
| Plaintiff | ) ) | |
| v. | ) ) | Civil No. 04-214-B-W |
| DOUGLAS ROBINSON, et al., | ) ) ) | |
| Defendant | ) | |

**Recommended Decision on Defendant Robinson's Motion for Summary Judgment**

Michael Parker has filed a civil rights complaint against three defendants complaining that they violated his Eighth Amendment right to be spared cruel and unusual punishment during a cell-extraction of Parker at the Maine State Prison. One of the defendants, Douglas Robinson, has moved for summary judgment. (Docket No. 81.) Robinson argues that he cannot be held liable for his active involvement in the incident or on a theory that he had a duty to intervene. I recommend that the court deny the motion for summary judgment as, drawing inferences from the direct and circumstantial evidence favorable to Parker, Parker has managed to create a genuine dispute as to facts material to his Eighth Amendment claim against Robinson.

*Discussion*

*Summary Judgment Standard*

"To warrant … an order for summary judgment" in favor of Robinson,

> the record must disclose no genuine issue as to any material fact and show conclusively that the movant is entitled to judgment as a matter of law. See Fed.R.Civ.P. 56(c). An issue is genuine if, on the evidence presented,

> it "may reasonably be resolved in favor of either party" at trial. Garside v. Osco Drug, Inc., 895 F.2d 46, 48 (1st Cir.1990). By like token, a fact is material if it "possess[es] the capacity to sway the outcome of the litigation under the applicable law." Cadle Co. v. Hayes, 116 F.3d 957, 960 (1st Cir.1997) (internal quotation marks omitted). In the final analysis, then, "[t]he nonmovant may defeat a summary judgment motion by demonstrating, through submissions of evidentiary quality, that a trialworthy issue persists." Iverson v. City of Boston, 452 F.3d 94, 98 (1st Cir.2006).

Cordi-Allen v. Conlon, 494 F.3d 245, 249 -50 (1st Cir. 2007). In applying these tenets," I "take the facts in the light most hospitable to" Parker "and draw all reasonable inferences in [his] favor." Id. at 250 (citing Galloza, 389 F.3d at 28.) "When doing so, however," I "give no weight to conclusory allegations, unsupported conjecture, or free-wheeling invective," id., proffered by either side.

### *Eighth Amendment Cruel and Unusual Punishment Standard*

The United States Supreme Court has held that "whenever prison officials stand accused of using excessive physical force in violation of the Cruel and Unusual Punishments Clause, the core judicial inquiry is … whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." Hudson v. McMillian, 503 U.S. 1, 6-7 (1992). See also Skinner v. Cunningham, 430 F.3d 483, 488-89 (1st Cir. 2005) (applying this standard to Eighth Amendment cell extraction claims). "[T]he extent of injury suffered by an inmate is one factor that may suggest 'whether the use of force could plausibly have been thought necessary' in a particular situation, 'or instead evinced such wantonness with respect to the unjustified infliction of harm as is tantamount to a knowing willingness that it occur.'" Hudson, 503 U.S. at 7 (quoting Whitley v. Albers, 475 U.S. 312, 321 (1986)). In addition to the extent of injury, "several factors are relevant, including the need for the application of the force,

the amount of force applied, the threat an officer reasonably perceived, [and] the effort made to temper the severity of the force used. Fillmore v. Page, 358 F.3d 496, 503 - 04 (7th Cir. 2004) (citing DeWalt v. Carter, 224 F.3d 607, 619 (7th Cir.1999)); accord Smith v. Mensinger, 293 F.3d 641, 649 (3d Cir. 2002); Baldwin v. Stalder, 137 F.3d 836, 838-39 (5th Cir. 1998).

*Standard for Robinson's Liability as Supervisor/ for Failure to Intervene*

The Third Circuit has directly addressed the question of the liability of a prison officer when it is argued that he or she failed to intervene when other correctional officers were inflicting unconstitutional force. The Smith v. Mensinger Panel reasoned:

> The approving silence emanating from the officer who stands by and watches as others unleash an unjustified assault contributes to the actual use of excessive force, and we cannot ignore the tacit support such silence lends to those who are actually striking the blows. Such silence is an endorsement of the constitutional violation resulting from the illegal use of force. It is incompatible with the restrictions imposed under the Eighth Amendment, and is therefore unacceptable. We will not immunize such conduct by suggesting that an officer can silently contribute to such a constitutional violation and escape responsibility for it. The restriction on cruel and unusual punishment contained in the Eighth Amendment reaches non-intervention just as readily as it reaches the more demonstrable brutality of those who unjustifiably and excessively employ fists, boots or clubs.
> Although our case law refers to police officers, not corrections officers, this does not change our analysis. Both are law enforcement officers, both are sworn to uphold the law, and both are authorized to use force (even deadly force) toward that end. We are, of course, aware of the obvious security concerns inside the close confines of a prison. However, that is simply one factor that must be considered in determining if a particular application of force is reasonable. It does not suggest a different Eighth Amendment inquiry for corrections officers as opposed to police officers. The law does not allow either to condone or cover up the use of excessive force. Similarly, neither can escape liability by turning either a blind eye or deaf ear to the illegal conduct of their colleagues.

3

293 F.3d 641, 650 - 52 (3d Cir. 2002) (footnotes omitted).  See also Fillmore v. Page, 358 F.3d at 505-06; Miller v. Smith, 220 F.3d 491, 495 (7th Cir. 2000); Priester v. City of Riviera Beach, 208 F.3d 919, 927 (11th Cir. 2000).

Also a concern here is whether or not Robinson can be held liable in his supervisory capacity.  A supervisor, "'may be found liable only on the basis of her own acts or omissions.'"  Gutierrez-Rodriguez v. Cartagena, 882 F.2d 553, 562 (1st Cir. 1989) (quoting Figueroa v. Aponte-Roque, 864 F.2d 947, 953 (1st Cir.1989)).  "It must be shown that the supervisor's conduct or inaction amounted to a reckless or callous indifference to the constitutional rights of others."  Id.  That is, "indifference that rises to the level of being deliberate, reckless or callous, suffices to establish liability under § 1983."  Id.  "Finally, there must be 'an "affirmative link" between the street-level misconduct and the action, or inaction, of supervisory officials.'"  Id. (citing Woodley v. Town of Nantucket, 645 F.Supp. 1365, 1372 (D. Mass 1986)).  "This causation requirement can be satisfied even if the supervisor did not participate directly in the conduct that violated a citizen's rights; for example, a sufficient casual nexus may be found if the supervisor knew of, overtly or tacitly approved of, or purposely disregarded the conduct."  Maldonado-Denis v. Castillo-Rodriguez, 23 F.3d 576, 582 (1st Cir. 1994).

*Material Facts*

There is no dispute that at all relevant times, Michael Parker has been a prisoner in the custody of the State of Maine Department of Corrections, incarcerated at Maine State Prison in Warren.  (SAMF ¶ 49; Reply. SAMF ¶ 49.)  On April 16, 2004, he was involved in a verbal dispute with the correctional officers on duty concerning the fact that he had been served a meal that he could not eat because it contained seafood.  (SAMF

4

¶ 50; Reply. SAMF ¶ 50.)  Parker is allergic to seafood and was placed on a no-fish diet by the prison.  (SAMF ¶ 51; Reply. SAMF ¶ 11.)  During the course of the verbal dispute described above, he asked to speak with the supervisor on duty in hopes of getting a meal that he would be able to eat.  (SAMF ¶ 52; Reply SAMF ¶ 52.)

Sergeant Robinson, the moving defendant, was a supervisor on duty that evening; the other supervisor on duty was Sergeant Brooks. (SAMF ¶ 53; Reply SAMF ¶ 53; SMF ¶ 2; Resp. SMF ¶ 2.)  There is no dispute that Robinson was supervising during the cell extraction.  (SMF ¶ 1; Resp. SMF ¶ 1.)

*The cell extraction*

In order to get Robinson to come and talk to him, Parker covered the window of his cell during the inmate count that evening.  (SAMF ¶ 54; Reply SAMF ¶ 54.)  As a result of his refusal to uncover the window to his cell, Robinson ordered a tactical team (referred to as a cell-extraction team) of correctional officers to forcibly remove Parker from his cell. (SAMF ¶ 55; Reply SAMF ¶ 55.)  Before the cell extraction team entered his cell, Parker informed Sergeant Robinson that it was his intention to cooperate in the extraction. (SAMF ¶¶ 56, 57; Reply SAMF ¶ 56.)  Initial efforts to open the door using the pole were unsuccessful. (SAMF ¶ 59; Reply SAMF ¶ 59.)  Parker attempted to assist the officers in gaining access to his cell by removing the paper that he had used to jam the door closed.  (SAMF ¶ 57; Reply SAMF ¶ 57.)[1]  In order to get the cell door open, Robinson had to use a metal pipe/pole to pry the door open. (SMF ¶ 3; Resp. SMF ¶ 3; SAMF ¶ 58; Reply SAMF ¶ 58.)  Once the door was fixed so that the officers could enter, Parker was instructed to lie down on his bunk.  (SAMF ¶ 60; Reply SAMF ¶ 60.)

---

[1] Robinson observes, as a qualification, that "his" attempt was unsuccessful.  (Reply SMF ¶ 57.) The paragraph of the complaint cross-referenced by Robinson indicates that no matter what Parker tried to do he could not assist with the un-jamming of the door.  (Compl. ¶ 26.)

5

There is no dispute that Parker complied with the command that he lie down on his bunk during the cell extraction. (SAMF ¶ 61; Reply SAMF ¶ 61.) While Parker was lying down on his bunk, five correctional officers on the extraction team entered his cell. (SAMF ¶ 62; Reply SAMF ¶ 62.) The first officer was carrying a large plastic shield. (SAMF ¶ 63; Reply SAMF ¶ 63.)

According to Parker, once they were in the cell four of the officers slammed down on top of Parker, smothering him with the shield and the weight of their bodies. (SAMF ¶ 64; see also SMF ¶ 8; Resp. SMF ¶ 8.) Despite the fact that Parker made no attempt to resist the extraction, two of the officers in the cell, defendants Barbeau and Palmer, forcibly executed the extraction. (SAMF ¶ 65.) It is Parker's contention that defendants Barbeau and Palmer both struck Parker with their fists numerous times while in the process of shackling him. (SAMF ¶ 66; Parker Aff. ¶ 10.)[2] Parker maintains that he was making no attempt to resist the extraction, therefore the officers were not in fact 'restraining' him. (Resp. SMF ¶ 9; SAMF ¶¶ 52, 62-66.)[3] There is no genuine dispute that Parker yelled out to Robinson, asking why he was being beaten despite his

---

[2]    Robinson denies this assertion as to Palmer, stating that it should be stricken because at his deposition Parker indicated that he did not know whether or not Palmer did in fact hit him in the cell. (Reply SAMF ¶ 66; Parker Dep. at 174, lines 1-2.)

Because the defendant has chosen not to submit the entire Parker deposition to the court but has selectively culled the pages relied on by Robinson, the court is frustrated in its efforts to put the selected exchange in context as the defendant has not provided the court with the proceeding page or pages. It must be pointed out that directly after the statement pounced on by Robinson, Parker indicates that he was hoping to ask Palmer more as to what he saw (and I assume did) at a deposition.

With respect to the defendant's selective use of the deposition, I note that Parker commenced this law suit as a pro se prisoner and was appointed counsel at a late stage. The issue of obtaining the Parker transcript for the purpose of Parker's prosecution of his claims has already been joined with the defendant, who – represented by a Maine assistant attorney general – had been unwilling or unable to assist on this front.

Assuming another passive aggressive position, Robinson also alleges that the fact as to Palmer should be stricken because Parker did not expressly allege in Paragraph 30 of his complaint that Palmer (as well as Barbour) struck him in the cell. Parker's complaint allegations were that both Palmer and Barbour were the lead officers who both "slammed down" on Parker. (Compl. ¶ 29.) At his deposition Parker indicated that he assumed that Palmer saw what Barbour was doing. (Parker Dep. at 174.)

[3]    Parker maintains that the officers were physically assaulting Parker in retribution for Parker's action in jamming his cell door closed.

6

cooperation with the extraction. (SMF ¶ 6; Resp. SMF ¶ 6; SAMF ¶ 67; Reply SAMF ¶ 67; Parker Aff. ¶ 11.) Parker believes that Robinson heard Parker pleading with him to intervene and that Robinson was present and observing the extraction at all relevant times. (SAMF ¶¶ 68, 69; Parker Aff. ¶¶ 11, 12.)

According to Robinson, he was outside the cell facing away from the opening. (SMF ¶ 4; Robinson Aff. ¶ 2; Parker Dep. at 68.) As a result, Robinson maintains that he did not see what happened when the cell extraction team entered the cell initially. (SMF ¶ 5; Reply SAMF ¶¶ 64, 65, 66, 67, 68, 69; Robinson Aff. ¶ 2.) It is Robinson's contention that he did not see anyone slam down on top of Parker; he did not see anyone strike Parker in any way; and he did not see anyone choke him. (SMF ¶¶ 10. 11, 12; Robinson Aff. ¶ 4; Parker Dep. at 174.) Robinson further maintains that when Parker was yelling to Robinson, the vent was uncovered and it was extremely loud in the cell to the point it "was possible" that they were not able to hear yelling back and forth between them. (SMF ¶ 7; Parker Dep. at 46, 95 – 96.) Robinson points out that during his deposition Parker (after indicating his belief that Robinson probably heard him; that it was highly unlikely that he did not because he was yelling) acknowledged that he did not have actual knowledge of this and that it was possible that he did not. (Reply SAMF ¶ 68; see Parker Dep. at 95-96.) Robinson reports that he did not hear Parker complain that anyone had done any of these things to him. (SMF ¶ 13; Robinson Aff. ¶ 5; Parker Dep. at 95 – 96.) When Robinson entered the cell, he saw that Parker was on his bunk and the four officers making up the extraction team were attempting to restrain him. (SMF ¶ 9; Robinson Aff. ¶ 3.)

In response to Robinson's denial that he saw or heard anything, Parker insists that there is circumstantial evidence that indicates that Robinson watched the cell extraction in that he was present in a supervisory capacity and that, at all times that Parker was able to observe Robinson, Robinson was watching the events in the cell unfold. (Resp. SMF ¶¶ 4,5; SAMF ¶ 69; Parker Aff. ¶ 12; Robinson Aff. ¶ 1.) Parker reflects that the time it took Robinson to pry open the door may have caused him to miss one or two seconds of the extraction. (Resp. SMF ¶ 5.) Parker acknowledges that it is possible that Robinson was unable to hear Parker, but given his proximity to the cell and the fact that Parker was yelling makes it unlikely. Furthermore, Parker and Robinson carried on an extended conversation (presumably at a different time) while the vent was uncovered. (Resp. SMF ¶ 7; Parker Dep. 47; SAMF ¶¶ 67, 68, 69.) Parker reiterates that he yelled out to Robinson, asking why he was being beaten despite his cooperation with the extraction (SAMF ¶ 67; Parker Aff. ¶ 11) and Parker believes that Robinson heard Parker pleading with him to intervene (SAMF ¶ 68; Parker Aff. ¶ 11).

*Events in the corridor*

There is no dispute that once Parker was restrained, Robinson asked if he would cooperate by walking out of his cell (SMF ¶ 14; Resp. SMF ¶ 14) and when he said he would, Robinson ordered the team to support him as they picked him up from his bunk and to walk him out of his cell. (SMF ¶ 15; Resp. SMF ¶ 15). The parties agree that once the extraction team had Parker shackled, defendants Barbeau and Palmer lifted him to his feet. (SAMF ¶ 70; Reply SMF ¶ 70.) Barbeau and Palmer each held one of Parker's shackled arms behind his back and began escorting him down the corridor away

from his cell towards a receiving area where he was to be placed in a restraint chair. (SAMF ¶ 71; Reply SMF ¶ 71.)

Neither party disputes that Robinson saw what happened as Parker was beginning to be escorted and that around the same time, he was also talking on the radio; Parker had started to say something about not being able to keep up with the escorting officers' fast pace, when he was suddenly picked up and slammed into the floor of the corridor. (SMF ¶ 17, 18; Resp. SMF ¶¶ 17, 18.)

More specifically, according to Parker, as defendants Barbeau and Palmer escorted Parker down the corridor they began to raise his arms (which were shackled behind his back) causing his entire body to lean forward, making it difficult, if not impossible, for him to keep up with their pace. (SAMF ¶ 72; Parker Aff. ¶ 14.) Parker at least began to ask Barbeau and Palmer to slow down because he was having difficulty keeping up with their pace. (SAMF ¶ 73; Reply SAMF ¶ 73; Parker Aff. ¶ 15; Parker Dep. at 99.) In response, Barbeau and Palmer picked Parker up off the ground and slammed him headfirst into the floor. (SAMF ¶ 74; Parker Aff. ¶ 15.) Robinson was following behind Parker, Barbeau, and Palmer at the time Parker was slammed into the floor. (SAMF ¶ 75; Parker Aff. ¶ 16.) Parker believes that Robinson saw what happened although he is not sure; he believes that as a supervisor Robinson should have been vigilant. (SAMF ¶ 76; Parker Aff. ¶ 16; Parker Dep. at 108-09.) After Parker was slammed into the floor Parker called out to Robinson, again asking why he was being treated in this manner. (SAMF ¶ 77; Parker Aff. ¶ 16.)

According to Robinson, when the officers started to walk Parker out, Robinson again told them to support him and turned away to see if the pipe used to open the cell

9

door was secure and to see if anything like a handcuff key or other contraband had been dropped or left where a prisoner could obtain it. (SMF ¶ 16; Robinson Aff. ¶ 7.) It is his contention that he did not see any officer push Parker's arms above his head or otherwise make it difficult for him to walk. (SMF ¶ 21; Robinson Aff. ¶ 9; Parker Dep. at 108.) He asserts that if Barbeau and Palmer did raise Parker's arms in a manner that made it difficult for Parker to keep pace and if they did slam Parker down in response to Parker's objection, Robinson was not aware of it as he was not directly behind the trio. (Reply SMF ¶¶ 72, 74, 75, 76, 77; Robinson Aff. ¶¶ 7,8,9.) He states that he did not see any officer lift Parker up and slam him onto the floor. (SMF ¶ 22; Robinson Aff. ¶ 9; Parker Dep. at 108 -09, 174- 75.) When Robinson turned to look toward Parker and the officers, he saw that Parker was almost on the floor; Robinson assumed that he had been taken to the floor because of resisting as this maneuver is standard practice to prevent the prisoner or the officers being injured as a result of the prisoner struggling. (SMF ¶ 19; Robinson Aff. ¶ 8.)

In response to Robinson's assertions that he did not witness the force used against Parker in the corridor, Parker contends that the circumstantial evidence indicates that Robinson did indeed observe the events leading up to Parker's being slammed to the floor. (Resp. SMF ¶ 21.) He points out that Robinson was following behind Parker, Barbeau, and Palmer at the time Parker was slammed into the floor and that he does concede that he saw at least the final moments of this event. (Resp. SMF ¶ 22) (citing SMF ¶ 19); Resp. SMF ¶¶ 16, 75, 76; SAMF ¶¶ 75, 76; Parker Aff. ¶ 16.). Parker also relies on his pre-slamming efforts to comply with the officers: before the cell extraction team entered his cell, Parker informed Robinson that it was his intention to cooperate in

the extraction (Resp. SMF ¶ 20; SAMF ¶ 56; Parker Aff. ¶ 5); he complied with the command that he lie down on his bunk during the cell extraction (Resp. SMF ¶¶ 61, 62; Parker Aff. ¶ 8);  he had taken no action to resist the efforts of the officers extracting him from his cell and escorting him to the receiving area (Resp. SMF ¶ 20; SAMF ¶ 61, 62, 65); and, by Robinson's own admission, he heard Parker complain that he was not able to keep pace (Resp. SMF ¶ 20)(citing SMF ¶ 18).

There is no dispute that Robinson then went to where Parker was on the floor of the corridor and told him to stop fighting and again asked him if he would cooperate by walking.  (SMF ¶ 23; Resp. SMF ¶ 23.)  According to Robinson, when Parker said he would cooperate, Robinson ordered the team to support him as they picked him up from the floor, giving specific instructions on how to do so, and to continue walking him. (SMF ¶ 24; Robinson Aff. ¶ 10.)  Parker retorts that Robinson asked Parker if he was willing to walk to the receiving area but that he did not order the officers to support Parker.  (Resp. SMF ¶ 24; Parker Dep. at 110-11.)

### *The handcuffs*

 Barbeau and Palmer ultimately escorted Parker to the receiving area at which point he was secured in a restraint chair.  (SAMF ¶ 78; Resp. SAMF 78.)  When they got to the receiving area, where the restraint chair is located, and the team was changing Parker's clothes, Parker complained that the cuffs were too tight and asked that they be loosened. (SMF ¶ 25; Resp. SMF ¶ 25; SAMF ¶ 79.)

With respect to the handcuffing, Robinson relates that he handed one of the officers the handcuff key to loosen the handcuffs and that Robinson observed him doing so.  (SMF ¶¶ 26, 27; Robinson Aff. ¶ 11.)  When Parker then complained that the

11

handcuff on his right wrist was too tight, Robinson ordered that it be loosened and observed that being done. (SMF ¶ 28; Robinson Aff. ¶ 11.) Once that was done, Parker stopped complaining about the handcuffs. (SMF ¶ 29; Robinson Aff. ¶ 12.) However, during this time, Parker did complain several times that Sergeant Brooks had let him be abused by the officers who had taken him out of the cell. (SMF ¶ 30; Robinson Aff. ¶ 13.)[4] Robinson insists that Parker did not utter a similar charge against Robinson. (SMF ¶ 31; Robinson Aff. ¶ 13.)

Parker insists that once he was in the restraint chair, Parker informed the officers present that his handcuffs were too tight (Resp. SMF ¶ 33; SAMF ¶¶ 79; Parker Aff. ¶ 17) (see also SAMF ¶¶ 80, 81), but that none of the officers present loosened the handcuffs. (Resp. SMF ¶ 26.) He avers that Sergeant Robinson and other officers present failed to take adequate steps to ensure that Parker's handcuffs were loosened. (SAMF ¶ 81; Parker Aff. ¶ 18.) Eventually, Parker began to feel excruciating pain in his hands. (SAMF ¶ 82; Parker Aff. ¶ 18.) Parker continued to vigorously complain to the officers present that his handcuffs were too tight. (SAMF ¶ 83; Parker Aff. ¶ 18.) After repeated complaints about the cuffs were ignored, Parker's hands began to go numb. (SAMF ¶ 84; Parker Aff. ¶ 19.) Parker informed the correctional officer present at that time that something was seriously wrong with his hands. (SAMF ¶ 85; Parker Aff. ¶ 19.) The officer failed to loosen the handcuffs in response to Parker's complaint that something was seriously wrong. (SAMF ¶ 86; Parker Aff. ¶ 19.) And, as a direct result of Robinson's failure to ensure that Parker's handcuffs were loosened, Parker maintains that he has suffered permanent damage to his hands. (SAMF ¶ 87; Parker Aff. ¶ 20.)

---

[4]  Parker admits Paragraph 30 but argues that it should be stricken because it is not relevant to the issues before the Court. Its relevance may be marginal but it conceivably has some contextual relevance.

(See also Resp. SMF ¶¶ 27-29.) With regards to Robinson's assertion that Parker complained about Brooks's failure to intervene but not Robinson's, Parker asserts that he complained about Robinson's failure to intervene on numerous occasions through the ordeal and repeatedly asked why Robinson was allowing him to be beaten. (Resp. SMF ¶ 31; SAMF ¶¶ 67, 68, 77.)

For his part, Robinson continues to maintain that if things were as Parker paints them, Robinson "was not aware of it" and he specifically disavows hearing Parker say anything about the handcuffs being too tight or requesting that the handcuffs be loosened. (SMF ¶ 33; Robinson Aff. ¶ 14; Reply SAMF ¶¶ 81-87; Robinson Aff. ¶ 14.) With respect to permanent damage to Parker's wrist, Robinson asserts that Parker is not competent to express an expert opinion. (Reply SAMF ¶ 87.)[5]

There is no dispute that Robinson stayed in the receiving area and was there when the nurse came in to check Parker. (SMF ¶ 34; Resp. SMF ¶ 34.) Sergeant Brooks was right there with the nurse when the nurse checked Parker. (SMF ¶ 35; Resp. SMF ¶ 35.) This was approximately ten minutes after Parker had been placed in the restraint chair. (SMF ¶ 36; Resp. SMF ¶ 36.) Robinson insists that he observed the nurse appearing to check the handcuffs. (SMF ¶ 39; Robinson Aff. ¶ 17; Parker Dep. at 123, 175.) He maintains that if the nurse had told Robinson that the handcuffs were too tight, he would have ordered them loosened again. (SMF ¶ 41; Robinson Aff. ¶ 18.)

Parker maintains that he does not remember a nurse actually checking his handcuffs. (Resp. SMF ¶ 39; Parker Dep. at 175.) He reiterates that Robinson was present when Parker complained about his handcuffs being too tight (Resp. SMF ¶ 41;

---

[5] To be sure, Parker could not testify as a medical expert but he could testify about his personal experience of the injury.

SAMF ¶ 80; Parker Aff. ¶ 17) and that in his view Robinson and other officers present failed to take adequate steps to ensure that Parker's handcuffs were loosened (Resp. SMF ¶ 41; SAMF ¶ 81; Parker Aff. ¶ 18).[6]

There is no dispute that Robinson did not hear the nurse tell Sergeant Brooks that the handcuffs were too tight (SMF ¶ 42; Resp. SMF ¶ 42) and that the nurse did not tell Robinson that the handcuffs were too tight (SMF ¶ 42; Resp. SMF ¶ 42). In fact, according to Parker, the nurse said the handcuffs were fine. (SMF ¶ 44; Parker Dep. at 123, 175 -176.)[7]

When the nurse finished checking Parker, Robinson was satisfied that he had determined that the handcuffs were not too tight. (SMF ¶ 45; Robinson Aff. ¶ 19.)[8] Robinson then left the area to spend the rest of his shift dealing with the aftermath of this incident, including cell extractions of other prisoners who Robinson describes as having become agitated and who had begun to misbehave, conduct that Robinson attributes to Parker's actions. (SMF ¶ 46; Resp. SMF ¶ 46.) Parker did not see Robinson again that night. (SMF ¶ 47; Resp. SMF ¶ 47.) When Robinson's shift ended, he briefed Sergeant Duguay about the events involving Parker so that he could take any necessary follow up actions. (SMF ¶ 48; Resp. SMF ¶ 48.)

---

[6] Robinson, relying on his own affidavit, maintains that it is a standard practice that a nurse check handcuffs while a prisoner is in the restraint chair to make sure they are not too tight. (SMF ¶ 37; Robinson Aff. ¶ 16.) Robinson also maintains that it is also standard practice for the nurse to let a sergeant know if they are too tight and, if so, for them to be loosened and then rechecked by the nurse. (SMF ¶ 38; Robinson Aff. ¶ 16.) Robinson was sure that if the nurse had said they were too tight while he was checking Parker, Sergeant Brooks would have ordered them loosened again. (SMF ¶ 40; Robinson Aff. ¶ 18.) Parker objects to these assertions on the grounds that Robinson has not set forth a foundation justifying reliance on these representations. (Resp. SMF ¶¶ 37, 38, 40.)

[7] Parker requests that Paragraph 44 be stricken on the grounds that it is inadmissible hearsay. (Resp. SMF ¶ 44.)

[8] As set forth in his Statement of Additional Facts 79 through 84, Parker insists that there was circumstantial evidence that Robinson could not have been satisfied that the handcuffs were not too tight. (Resp. SMF ¶ 45.)

14

*Alleged efforts to alter an incident report*

Finally, according to Parker, subsequent to the events on April 16, 2004, Sergeant Robinson instructed at least one member of the cell extraction team to alter his report created in connection with the extraction in order to conceal the mistreatment that occurred that evening. (SAMF ¶ 88; Parker Aff. ¶ 21; Parker Dep. at 72-74.) Correctional Officer Ross was a member of the cell extraction team that removed Parker from his cell. (SAMF ¶ 89; Reply SAMF ¶ 89; Parker Aff. ¶ 21; Parker Dep. at 72-74.) Ross told Michael Parker that he was instructed by Sergeant Robinson to falsify his report concerning the extraction in order to conceal mistreatment on the part of the cell-extraction team. (SAMF ¶ 90; Parker Aff. ¶ 21; Parker Dep. at 72 -74.) The referenced portion of the Parker deposition indicates that Ross told Parker that Robinson wanted the incident report to indicate that there was butter or some type of food on the floor to cover up that fact that mace had been employed. (Parker Dep. at 73.) Also, Robinson wanted to indicate that Parker had soaked his floor suggesting his intent to hurt the officers. (Id.) Parker said that he had seen a report by Ross in which he had crossed some things out. (Id.)

Robinson responds to these assertions by citing to a second affidavit executed to respond to Parker's additional facts. In this affidavit Robinson states that in the entire time he has worked with the Maine Department of Corrections, he never told or asked any officer to put any particular content in a report or to alter the content of a report in any way. (Sec. Robinson Aff. ¶ 1.) He attaches the report that Officer Ross gave to him as the report he had written about the April 16, 2004, incident involving Parker, which report he then sent on to various supervisory personnel just as he had received it from

15

Officer Ross. (Id. ¶ 2; Docket No. 114-2.) To Robinson's knowledge, this is the only report ever written by Officer Ross about this incident. (Sec. Robinson Aff ¶ 3.) The report does conclude with a non-chronological note in which Ross indicates that when they entered the cell the floor was very wet and slippery and that the corridor area where Parker allegedly started to resist was very wet due to water on the floor. (Docket No. 114-2.) There is no evidence of any content having been crossed out.

*Recommended Disposition*

Robinson has not attempted to demonstrate that Parker's Eighth Amendment rights were not violated during the cell extraction by members of the cell-extraction team he was supervising. Rather, Robinson has attempted to prove that -- even if there was force applied during the cell extraction that was not applied in a good-faith effort to maintain or restore discipline but was applied maliciously and sadistically to cause harm, Hudson, 503 U.S at 6-7[9] – he cannot be held liable. There is sufficient evidence on this record that members of the cell extraction team, e.g., Palmer and Barbeau, cruel and unusually punished Parker and it is for a jury to make this determination. The question is, then, whether or not there is a genuine dispute of the facts material to the question of whether or not, under the Smith v. Mensinger standard, Robinson had a duty to and failed to intervene in the application of unconstitutional force or, in the alternative, whether or not he can be held liable as a supervisor because there was a causal connection between his alleged deliberate indifference and the application of unconstitutional force. In my view, the facts put into dispute by Parker, reliant as many of them are on circumstantial evidence, are sufficient to survive Robinson's case for summary judgment. Quite simply,

---

[9]   Compare Skinner v. Cunningham, 430 F.3d 483, 488-89 (1st Cir. 2005).

the resolution of the disputed facts material to the question of Robinson's liability turns on a credibility determination that must be left to the jury; the issue, "on the evidence presented, … 'may reasonably be resolved in favor of either party'" at trial, see Cordi-Allen, 494 F.3d at 249  (quoting Garside v. Osco Drug, Inc., 895 F.2d 46, 48 (1st Cir.1990)), and, so,  "'a trialworthy issue persists,'" id. at 50 (quoting  Iverson v. City of Boston, 452 F.3d 94, 98 (1st Cir.2006)).

.

*Conclusion*

For the reasons set forth above, I recommend that the Court deny Robinson's motion for summary judgment (Docket No. 81).

NOTICE

A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which *de novo* review by the district court is sought, together with a supporting memorandum, within ten (10) days of being served with a copy thereof.  A responsive memorandum shall be filed within ten (10) days after the filing of the objection.

Failure to file a timely objection shall constitute a waiver of the right to *de novo* review by the district court and to appeal the district court's order.

/s/ Margaret J. Kravchuk
U.S. Magistrate Judge

September 26, 2007.