UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

| | |
|---|---|
| MICHAEL PARKER, </br></br>   Plaintiff, </br></br> v. </br></br> DOUGLAS ROBINSON, et al., </br></br>   Defendants | ) </br> ) </br> ) </br> ) </br> ) Civil No. 4-214-B-K </br> ) </br> ) </br> ) </br> ) |

**MEMORANDUM OF DECISION[1]**
**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

Michael Parker, an inmate at the Maine State Prison, has brought suit against three former corrections officers, Douglas Robinson, John Palmer, and Darren Barbeau. Parker claims the officers violated his constitutional rights by using excessive force during a cell extraction precipitated by his own violation of the rules at the prison. I conducted a three-day jury-waived trial on March 26 and April 3 and 4, 2008. I now direct that the clerk enter judgment for all defendants based upon the following findings of fact and conclusions of law.

**Applicable Legal Standards**

The United States Supreme Court has held that "whenever prison officials stand accused of using excessive physical force in violation of the Cruel and Unusual Punishments Clause, the core judicial inquiry is … whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." Hudson v. McMillian, 503 U.S. 1, 6-7 (1992). See also Skinner v. Cunningham, 430 F.3d 483, 488-89 (1st Cir. 2005) (applying this standard to Eighth Amendment cell extraction claims). "[T]he extent of injury suffered by an

---

[1] Pursuant to 28 U.S.C. § 636(c), the parties have consented to have United States Magistrate Judge Margaret J. Kravchuk conduct all proceedings in this case, including trial, and to order entry of judgment.

inmate is one factor that may suggest 'whether the use of force could plausibly have been thought necessary' in a particular situation, 'or instead evinced such wantonness with respect to the unjustified infliction of harm as is tantamount to a knowing willingness that it occur.'" Hudson, 503 U.S. at 7 (quoting Whitley v. Albers, 475 U.S. 312, 321 (1986)). In addition to the extent of injury, "several factors are relevant, including the need for the application of the force, the amount of force applied, the threat an officer reasonably perceived, [and] the effort made to temper the severity of the force used." Fillmore v. Page, 358 F.3d 496, 503 -04 (7th Cir. 2004) (citing DeWalt v. Carter, 224 F.3d 607, 619 (7th Cir.1999)); accord Smith v. Mensinger, 293 F.3d 641, 649 (3d Cir. 2002); Baldwin v. Stalder, 137 F.3d 836, 838-39 (5th Cir. 1998).

Also a concern here is whether or not Defendant Robinson can be held liable in his supervisory capacity. A supervisor, "'may be found liable only on the basis of her own acts or omissions.'" Gutierrez-Rodriguez v. Cartagena, 882 F.2d 553, 562 (1st Cir. 1989) (quoting Figueroa v. Aponte-Roque, 864 F.2d 947, 953 (1st Cir.1989)). "It must be shown that the supervisor's conduct or inaction amounted to a reckless or callous indifference to the constitutional rights of others." Id. That is, "indifference that rises to the level of being deliberate, reckless or callous, suffices to establish liability under § 1983." Id. "Finally, there must be 'an "affirmative link" between the street-level misconduct and the action, or inaction, of supervisory officials.'" Id. (citing Woodley v. Town of Nantucket, 645 F.Supp. 1365, 1372 (D. Mass 1986)). "This causation requirement can be satisfied even if the supervisor did not participate directly in the conduct that violated a citizen's rights; for example, a sufficient causal nexus may be found if the supervisor knew of, overtly or tacitly approved of, or purposely disregarded the conduct." Maldonado-Denis v. Castillo-Rodriguez, 23 F.3d 576, 582 (1st Cir. 1994).

**Findings of Fact**

In April 2004 Douglas Robinson, John Palmer, and Darren Barbeau were all employed as corrections officers at the Maine State Prison in Warren, Maine. Today none of them are working in that capacity. Douglas Robinson is now an independent businessman with his own custom motorcycle shop in Gainesville, Texas. John Palmer is a Knox County patrol deputy with the sheriff's department. Darren Barbeau was terminated from employment at the prison as the result of an unrelated incident involving excessive force during a cell extraction in November 2004. He no longer works in law enforcement but now works at a paper mill in central Maine.

At 7:15 p.m. on April 16, 2004, Sgt. Douglas Robinson formed a cell extraction team for the express purpose of forcibly removing Michael Parker from his cell on B pod of the Maine State Prison in Warren, Maine. Included on that team were John Palmer and Darren Barbeau, Barbeau being a veteran of approximately 50 such cell extraction teams. As part of that process Robinson assigned one corrections officer the role of videographer, in accordance with prison policy, and this entire matter (with a few notable exceptions discussed below) is recorded on video tape that covers the time period from 7:16 p.m. until approximately 10:20 p.m.

The events that precipitated this lawsuit began at approximately 4:30 p.m. that afternoon when Parker received his evening meal tray. Parker has an allergy to fish and when fish was the main course on the prison dinner menu, he customarily received a portion of macaroni and cheese and some beans. The meal tray presented to him on April 16 did not contain any macaroni and cheese. Parker complained about his meal and after some back and forth with the B Pod officer, the tray was removed from his tray slot and dumped. Parker received no dinner. He wanted to remonstrate with the sergeant on duty, Douglas Robinson, about this situation, but

Robinson did not want to come to the cell block to discuss the matter. In fact, Robinson conveyed the message to Parker that the only way he would come down to "chat" with him would be with a cell extraction team.

Parker knew that Robinson, as the sergeant on duty, would respond to the cell block if the evening prisoner count did not proceed as required. The guards must visually appraise each inmate in order to complete the count. Parker put a piece of paper over his cell window making it impossible for the guards to see him and, thus, to complete their count. When the prisoner count cannot be successfully completed, the entire prison is forced to shut down and await verification regarding the "missing" prisoner. Parker understood that if Robinson had to come down to the cell block because of his failure to remove the paper from the window it would be with a cell extraction team. A cell extraction team consists of four corrections officers in protective gear including helmets and plexiglass shields, formed for the sole purpose of removing the prisoner from his cell and transporting him to a secure location, most commonly the restraint chair used to contain unruly prisoners. Nevertheless, Parker refused to comply with the request to remove the paper from the window.

Robinson and his team arrived at Parker's cell. Parker, anticipating that he would be maced as part of the cell extraction process, donned his own version of protective gear including a mask over his mouth and nose and a shirt covering his head. He removed the paper from his cell window to speak with Robinson but he was noncompliant with Robinson's repeated demands that he "cuff up." At this point on the videotape Parker obviously appears agitated. In this situation, in order to avoid the use of force through a cell extraction process a prisoner is given the opportunity to put his hands through his tray slot to allow the officer to put him in cuffs before entering the cell. In accordance with prison policy Robinson ordered Parker to cuff up at

4

least three times and Parker was noncompliant with each request. Moving to the next level of force in accordance with prison policy, Robinson warned Parker he was about to mace him and then proceeded to spray mace into the cell.

At that point the normal next step would be for the cell extraction team to enter the cell and remove the prisoner. In this case all did not go according to the procedure. Parker had wedged paper into the track where the hydraulic door was mounted and when the guards released the door they were unable to slide it open because of the paper and debris wedged into the track. The door would only open a few inches. Needless to say, and in spite of Robinson's protestations to the contrary, Robinson, as seen on the videotape, became frustrated and irritated. It was hot in the prison corridor and the other inmates were screaming taunts and insults at the guards. An hour was spent trying to open the door. During that time period Robinson sent the cell extraction team out of the corridor for awhile because they were even warmer than the other officers because they were wearing all of their protective paraphernalia. Finally the maintenance department had to respond to the scene in order to pry the door open.

As the hour elapsed the video demonstrates that Michael Parker generally became considerably less agitated. Judging from the tape he genuinely tried to assist the officers by removing the paper and releasing the door, but he was unable to unjam it. At one point Parker asked for a tool, which-- quite naturally -- Sergeant Robinson was not about to provide to him. Parker testified that the only tool he had in his cell was his toothbrush and it simply would not work to get the paper out of the crevice where he had forced the paper. At another point, after obtaining a verbal assurance from Robinson that he would not be maced again, Parker removed his protective mask, but then he donned it again. In sum, Sergeant Robinson could have fairly concluded that the situation was uncertain and he did not know how Parker would behave when

the cell door was finally opened. While Robinson might have used verbal tactics to further de-escalate the situation and avoid the forcible cell extraction, given the circumstances that were unquestionably unilaterally created by Parker's own misbehavior, there is no basis to conclude that Robinson was behaving maliciously or sadistically when he chose to proceed with the cell extraction process. When Robinson told Parker to have a seat on the bunk, Parker did so, appearing to be compliant with the guard's requests. On the other hand, he continued to wear the mask and display some agitation. Whether Parker would have complied with a request to cuff-up immediately prior to the entry of the cell extraction team is unclear because Robinson never asked him to do so after the initial series of requests. More than an hour later, when the door finally became un-jammed, Parker was not again asked to cuff up prior to the entry of the team. Defendants make much of the fact that Parker did not spontaneously offer to cuff up, but Parker had no knowledge of the use of force policy at the prison relating to extraction teams and, therefore, had no way of knowing that voluntarily cuffing up might have avoided a forcible cell extraction under prison use of force policies. Sergeant Robinson presumably knew the prison use of force policy and that voluntary compliance by the prisoner might negate the need for a forcible cell extraction. He did not renew his request that Parker submit to handcuffing and the cell extraction team proceeded to forcefully extract Parker from the cell.

  The 'number one' man, the first to enter the cell, on this particular cell extraction team was defendant Darren Barbeau and the second person to enter was defendant Palmer. Officers Tibbetts and Ross were behind them and effectively blocked the camera's view of whatever Barbeau and Palmer may have done to Parker upon initial entry into the cell. It is fair to say that this particular cell-extraction could not be viewed as a textbook example of how the process is supposed to work. For one thing, the sergeant and members of the team shouted conflicting

instructions at Parker. He was told to sit on his bunk. He did. Upon entry, the officers screamed at him to get on his back and lie down on the bunk. He did. Then someone realized that standard procedure is for the prisoner to lie on his stomach. By this time four men with all their gear were piled on top of Parker and Parker could not have rolled over if he wanted to. The officers turned Parker over onto his stomach in order to handcuff him behind his back. During this process Parker says Barbeau was choking and hitting him. I do not find any support for the notion that Barbeau was choking him; in fact Parker crying out "stop choking me" generates an inference that he was NOT being choked. I imagine that the situation caused Parker to feel as though he could not breathe and was choking, but there is no concrete evidence that any intentional choking took place. Parker also says that Barbeau gratuitously punched and hit him. The videotape provides no proof either way on this issue; of course, Barbeau denies he hit Parker and none of the officers saw anything. I am unable to make a specific finding about whether or not Barbeau punched Parker while he was on top of him in the cell, but I do find that it is unlikely Parker received any injury to the neck, face, or head as a result of the portion of this incident that occurred in his cell.

      Officer Palmer placed the handcuffs on Parker. Parker says the handcuffs were too tight. If Palmer did apply the cuffs too tightly during the initial portion of the extraction, it was done negligently and in the heat of the moment, not with any intent to cause injury to Parker. Once Parker had been handcuffed and shackled, the officers got him out off the bunk and proceeded to escort him down the corridor. Palmer and Barbeau were on each side of him. The other prisoners were hollering at the officers as they proceeded down the corridor. The extraction team moved very quickly and these events are best understood by watching the videotape. Parker was not visibly resisting or struggling against them as they moved rapidly into the

7

corridor, although, consistent with Parker's testimony, he was unable to keep up with the officers because he was in leg irons and his arms were bent behind his back in handcuffs and pulled up throwing him forward and off balance. Palmer described the position they had placed Parker in as an 'inverted L.' It is relatively clear on the videotape that Parker is dragging his feet. However, it is unclear whether this is intentional resistance on Parker's part or a consequence simply of his inability to keep up with the fast pace the officers set, given his awkward position. Based upon the testimony I heard, including both Parker's and Palmer's version of the walk down the corridor, I am satisfied that Parker was not actively resisting the officers.

     According to Palmer, at this juncture someone told Parker "stop resisting" and almost simultaneously Parker was taken to the ground. Palmer, who was walking on the right side of Parker, and should have been able to give a descriptive account of any active resistance by Parker, says only that Parker was resisting by dragging his feet and he does not know who made the 'stop resisting' comment, but it did not come from him. As for the reason for putting Parker on the floor, Palmer was considerably vague, saying he did not know if Parker went into Barbeau or Barbeau pulled or "whatever" but that Parker went to the left and, the next thing Palmer knew, Parker came back toward him and then was on the ground. According to Palmer, Parker was "placed" on the ground, not "slammed" onto the ground. The evidence is that Parker suffered a visible soft tissue injury to his shoulder and an injury above his eye. I find from the evidence it is more likely than not that those injuries occurred when Parker was taken down onto the hard cement floor in the corridor.

     In a matter of seconds after leaving the cell the entourage stopped as Parker was taken to the floor. The videotape of this portion of the incident does not afford a clear view of exactly what occurred. Barbeau testified that it was necessary to take Parker to the floor because he was

"struggling."  Palmer was a little less clear about why Parker went to the floor, noting that Parker appeared to be swaying back and forth and unsteady on his feet.  In any event it is clear that Parker was taken to the floor with sufficient force to cause a scrape and soft tissue injury to his shoulder and a cut of some sort over his eye.  Parker described the events as extremely forceful resulting in a momentary loss of consciousness.  It does not appear on the videotape that Parker appreciably lost consciousness and it is impossible to ascertain why he was taken to the floor except to note that it does not appear he was actively struggling and resisting the officers.  Certainly after they lifted him from the floor and walked the rest of the way to the elevator in a slower and more reasonable fashion Parker was completely compliant.

Parker's next stop was the restraint chair, a device in a special room at the Maine State Prison which is used, according to prison policy, "when it is apparent that a prisoner poses a real and immediate threat to his safety, the safety of others, or the security of the facility and no other reasonable alternative to the use of the restraint chair exists."  Before Parker was situated in the restraint chair his clothing was removed and he was placed in pants that contained Velcro leg fasteners.  This clothing change appeared to be in accordance with prison policy.  Also, during the clothing exchange, while Parker was outside the room where the restraint chair is located, his handcuffs were adjusted by Officers Barbeau and Palmer.

Parker was placed in the restraint chair where he remained from approximately 8:30 p.m. until 10:15 p.m. When an inmate is held in the restraint an officer is on "constant watch" observing the inmate and monitoring the videotape.  The first officer assigned to that role was Daniel Ross, who had also been the fourth member of the extraction team.  Ross, who was present in the corridor following the extraction, could add no information about the question of Parker's resistance prior to being taken to the ground.   Ross's turn at constant watch ran from

9

8:37 p.m. until 9:28 p.m. and during that time period he notes that Parker complained four or five times about the handcuffs being too tight and Parker's desire to see a nurse or Sergeant Brooks. The videotape confirms the log entries. Parker was seen by Nurse Liberty when he was first placed in the chair and the nurse checked his restraints and found no cause for alarm.

After Ross left the constant watch, Parker continued to complain of pain and the next constant watch officer tried to obtain another medical check at 9:40 p.m. but he was advised that medical was tied-up with other matters. The officer advised Sergeant Robinson at 9:50 that Parker was due for a medical check. Parker had told the officer on duty that he was still experiencing pain, loss of circulation, and was having trouble breathing. At 9:55 a new shift of officers responded to the restraint area to speak with Parker. They were apparently satisfied that he was calm enough to be released from the chair. Medical was called to the scene and Nurse Walsh responded. Although Nurse Walsh now denies it, Parker says she observed that the cuffs on his wrist were too tight and instructed the officers to loosen them. Unfortunately, the video does not record the interaction because the officer chose that precise moment (approximately 35 seconds in duration) to change from a plugged-in camera to a battery-operated one in order to record Parker's walk back to his new cell. Even if Parker's version of those events is accurate, it would not change the outcome of this litigation because I am satisfied by the videotape evidence that Palmer and Barbeau attempted to adjust the cuffs before Parker was placed in the restraint and that they did not deliberately tighten the cuffs prior to leaving him restrained in the chair, which is confirmed by Nurse Liberty's examination.

In any event, the evidence does support the finding that Parker experienced pain in his wrists, most probably from the manner in which the handcuffs restrained his arms while in the chair. He attempted to obtain photographs of his injuries from both the medical department and

the security department but was unable to do so. Parker was obviously contrite about the incident after it happened and wrote a letter of apology to the officers involved. He also faced disciplinary measures for his conduct vis-à-vis the cell door and was ordered as a part of the prison hearing process to spend 90 days in administrative segregation and he lost 90 days of good time for tampering with the locking device on his cell door and his destruction of prison property.

Parker accepted responsibility for his improper conduct but filed a prison grievance complaining about the cell extraction process. I incorporate the earlier findings I made vis-à-vis that grievance process. I also note that the prison's response to the grievance represented that the entire videotape had been reviewed and that everything the officers did during this extraction was in accordance with prison policy. I am satisfied that Parker's grievance was sufficiently robust to put the prison on notice that he was complaining about the excessive force used by the extraction team and the care and treatment he received upon being placed in the restraint chair.

## Discussion

### *The Scope of the Grievance*

The State of Maine takes the view that in order to proceed with claims in a 42 U.S.C. § 1983 action an inmate must grieve each claim through the administrative process with particularity to the state actors implicated, the relevant acts complained of, and set forth with particularity the legal claims envisioned. It is as if the State believes an inmate must preconceive a civil complaint prior to initiating the grievance process.

The point of the 42 U.S.C. § 1997e(a) exhaustion requirement is not to make sure prisoners identify their potential litigable civil rights claims early on but it is to give the correctional institution the opportunity to address (and hopefully resolve) the grieved-of

conduct/condition before the dispute moves to litigation.  The administrative grievance process is not a dress-rehearsal hurdle to civil litigation; the point is to give the correctional authorities the opportunity to address problems/incidents within the system and to remedy any shortfall without the necessity of defending the concern in a court of law.   On its face the grievance policy professes to provide inmates with an avenue for redress not an obstacle to prevent future lawsuits.[2]

Earlier in this action I addressed a motion for summary judgment premised on an argument that Parker failed to exhaust his administrative remedies.  Observing that the defendants had elected to press the exhaustion issue by "wielding § 1997e(a) as a sword rather than a shield," I recommended that this Court grant judgment against the defendants on their non-exhaustion affirmative defense (Docket No. 55) and this court affirmed that recommendation (Docket No. 59).  See Parker v. Robinson, 04-214-B-W, 2006 WL 2904780, *12 (D.Me. Oct. 10, 2006). With regards to a subsequent motion by Defendant Robinson for summary judgment I recommended denying the motion, see 2007 WL 2908813 (D. Me. Sept. 26, 2007), and this Court affirmed, rejecting an argument by Robinson that he was entitled to judgment on the particular aspect of Parker's claim pertaining to the application of handcuffs, see 2007 WL 4365354, 1 (D.Me. Dec. 10, 2007).

The question of how specific a prisoner's grievance must be to satisfy the 42 U.S.C. §1997e(a) exhaustion requirement has been ably addressed by Judge Saris in the District of Massachusetts in her recent opinion Carter v. Symmes, Civ. No. 06-10273-PBS, 2008 WL 341640 (D. Me. Feb. 4, 2008).  Parker's effort at grievance of his cell extraction meets the "like or reasonably related" standard for his Eighth Amendment claim embracing the entire process of

---

[2]   My experience with the Maine Department of Corrections is that there have been at least a few times in cases brought to this court that the Department has in fact treated grievances by recognizing the merits of the grievance and providing a meaningful response.

his cell extraction from the point of initial confrontation through to the point of his removal from the restraint chair. I stress here that there is no question in my mind that the prison reviewed Parker's grievance with a view to the totality of the procedure, relying on the nearly complete video of the extraction and his subsequent placement/monitoring in the restraint chair. The review was professedly to determine whether this entire course of response complied with the Maine State Prison's policies. There is no doubt in my mind that the prison had a full opportunity to review the actions of its personnel and that it took this opportunity. None of the evidence at trial dissuades me from my earlier conclusion that Parker satisfied the 42 U.S.C. § 1997e(a) exhaustion standard for his Eighth Amendment claim pertaining to the entire cell extraction process. See Maraglia v. Maloney, 499 F. Supp. 2d 93, 94-98 & n. 6 (D. Mass. 2007).

*The Claims against Sergeant Robinson*

The claims against Sergeant Robinson primarily relate to his supervisory role in this incident. During the summary judgment stage the issue was flagged as to if there was a dispute of fact as to whether Robinson was in a position to intervene and failed to do so when Barbeau and Palmer allegedly applied excessive force against Parker by assaulting him in the cell, applying the handcuffs too tightly, and throwing him to the floor of the corridor. Having now had the opportunity to view the video of these events a number of times, I am satisfied that Robinson did not fail to intervene and stop officers under his control from applying excessive force to Parker. If, indeed Barbeau did gratuitously strike Parker when he entered the cell as the first man on the extraction team, Robinson had no better vantage point to view that assault than I had when viewing the video tape. While they were removing Parker from the cell and taking him to the floor in the corridor, Robinson testified he was temporarily distracted by the need to secure the iron pipe and other tools that had been used to open the cell door. The incident of

13

taking Parker to the floor happened so quickly and resolved itself so fast, that Robinson did not have time to intervene.  Finally, immediately prior to Parker being placed in the restraint chair, Robinson instructed Palmer and Barbeau to adjust the handcuffs.  Robinson does not have any supervisory liability for any excessive force applied by Palmer or Barbeau.

      Trial testimony also raised the issue of whether Robinson should have direct personal liability for a constitutional violation because of his decision to proceed with the cell extraction and the placement of Parker in the restraint chair.  Clearly those decisions were made by Robinson alone and arguably the situation might have been handled differently.  However, there is no evidence that Robinson acted sadistically with the intent to cause harm when he proceeded with the cell extraction rather than giving Parker a final chance to "cuff up."  Parker had just caused a serious disturbance in the prison and created a situation that was extremely dangerous.  While he obviously calmed down during the hour prior to the extraction, Robinson had no real way of knowing whether Parker would remain calm when the door was opened.  Likewise, the decision to place Parker in the restraint chair rather than directly into another cell was not, in and of itself, a sadistic or cruel act designed to inflict punishment.  Placement in the restraint chair is accepted prison policy, not designed to punish a prisoner, but intended to give the authorities and the prisoner a cooling-off and assessment period in order to make sure the prisoner can safely be returned to a cell without further endangering himself or others.  In this case I cannot say that Robinson's decision to proceed in that fashion was unconstitutional and in violation of the Eighth Amendment, even if I agree with Parker that it might have been handled differently by a different sergeant.

*The Claims against John Palmer*

John Palmer's potential liability stems from his role in applying the handcuffs and in assisting in taking Parker to the floor in the corridor. His case is by far the easiest to decide. It is undisputed that he was the officer who placed the handcuffs on Parker initially and that he was present in the area outside of the restraint chair area when Barbeau "adjusted" the handcuffs. I am satisfied that Palmer did not intentionally place the cuffs on Parker in an unnecessarily restrictive fashion. I find his testimony credible. I do not disbelieve Parker that the cuffs caused him some pain and that may have been because of the way they were initially applied, the way they were adjusted by Barbeau, or the position of his arms while he was held in the restraint chair. If Palmer did fasten the cuffs too tightly it was not done with the intent to cause harm to Parker. Initially Palmer had to place the cuffs on quickly, under extremely adverse circumstances. There is nothing on the video tape or in the testimony to suggest he did anything intentionally improper.

The other point where Palmer interacted with Parker was as the officer escorting him in the corridor. However, it was Barbeau who made the decision to take Parker to the floor and Palmer did nothing to aggravate that situation. It was a fast moving series of events and even though Parker does not appear to be actively resisting on the videotape, Palmer heard other officers hollering to "stop resisting" and he knew that Parker was not moving along with him and Barbeau in a smooth, quick fashion. In the circumstances then existing in the corridor, when Barbeau decided to take Parker to the floor Palmer assisted him with only relatively minor injuries to Parker. That conduct clearly does not rise to the level of a constitutional violation.

*The Claims against Darren Barbeau*

The portion of Parker's claim pertaining to Darren Barbeau is the most difficult to assess because the videotape provides no real assistance as to what Barbeau may have done when he was on top of Parker in the cell or when he took Parker to the floor in the corridor. Additionally it was Barbeau who last adjusted the handcuffs prior to Parker being placed in the restraint chair. These events cumulatively form the basis of an unconstitutional use of force complaint against Barbeau. As I indicated in my factual findings, I cannot make a finding whether or not Barbeau may have gratuitously punched or hit Parker while in the cell. Parker says he did. Barbeau says he did not. Neither version is corroborated in terms of the objective facts known from the videotape and the other evidence in the case. Because Parker ultimately bears the burden of proof in this case, I have no choice but to resolve the equipoise in favor of Barbeau. I do note, however, it is telling that neither Ross nor Palmer, two other members of the extraction team, can give a very good explanation as to why Barbeau initiated the process of taking Parker to the ground in corridor. The claims that Parker was resisting are just not supported by the videotape. The officers could have slowed down and given Parker an opportunity to move with them rather than taking him to the floor. It does appear to me that the maneuver was unnecessary and unquestionably it caused injury to Parker's shoulder and eye. That being said, it simply is not the sort of excessive force, given the surrounding circumstances, that rises to the level of an Eighth Amendment violation.

*Conclusion*

This is a troubling case that raises many disturbing issues about the policies and practices of the Maine State Prison, ranging from its grievance policy to its use of the restraint chair in inappropriate circumstances. It is also a case that gives one a very real sense of the frustrations

and unbelievably difficult situations that prison guards face every day. Michael Parker behaved in a foolish way to get attention because he had been treated poorly regarding his evening meal; but, he then set in motion a chain of events which led to his own humiliation, discomfort, and injuries. The corrections officers were frustrated by Parker's conduct and that frustration might have impacted the way they handled the situation, but, after a careful review of the evidence, I conclude that they did not cross any constitutional line when they removed Parker from his cell and took him to the restraint chair. Indeed, the videotape, in large measure, supports the defendants' contention that they behaved in a professional and competent manner in accordance with the established practices and policies. Parker's <u>pro bono</u> counsel has presented Parker's case with superlative competence and care. However, in the final analysis these three officers cannot be found to have violated the Eighth Amendment because of their conduct on the evening of April 16, 2004. I direct the clerk to enter judgment for the defendants.

*So Ordered.*

May 22, 2007.

/s/Margaret J. Kravchuk
U.S. Magistrate Judge